PERRY, J.
This case is before the Court for review of the First District Court of Appeal’s decision in Walton v. State, 106 So.3d 522 (Fla. 1st DCA 2013). The First District held that minimum mandatory sentences under section 775.087, Florida Statutes— the 10-20-Life statute — must run consecutively when the sentences arise from a single criminal episode, irrespective of whether the defendant fires a firearm or only carries or displays it. Id. at 528. The First District certified conflict with Irizarry v. State, 946 So.2d 555 (Fla. 5th DCA 2006). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons discussed below, we quash the First District’s decision and remand for a new trial.
FACTS
On September 10, 2008, Kristina Salas and her sister, Karine Nalbandyan, placed their children into a parked car. As Salas leaned into the car, a man ambushed her, held a gun to her head, and demanded that she give him her purse or be killed. The two struggled over the purse until the gun *63 fell to the ground. Then the man picked up his gun, went to the other side of the car, and demanded Nalbandyan’s purse.
Detectives Shannon Fusco and James Johnston of the Jacksonville Sheriffs Office were investigating a theft nearby when they came upon the scene. Detective Fusco identified herself as a law enforcement officer and ordered the man to put his gun down. The man and another man at the scene responded by shooting at the detectives. Two eyewitnesses, La-shonda Jackson and her teenage daughter, Antoinette Gillan, observed the crime. Jackson later identified Leronnie Lee Walton as one of the men shooting at the detectives.
Almost two months after the crime, Detective Venosh and Detective Padgett interviewed Gillan. Detective Padgett instructed Gillan to look at a two photo arrays and identify anyone that she recognized in connection with the shooting. Gil-lan was unable to identify anyone in the first array. She then examined the second set of photographs and initially said she was not sure if she recognized anyone. Detective Padgett responded, “I noticed you moved that one [photo] and kind of looked back a little bit or something when you looked at that one.” Gillan replied that a man in one photo in the second array looked familiar. Detective Padgett explained to Gillan the importance of making an identification, noting how dangerous the shooters were and that her mother could have been killed. Detective Padgett then said, “I’m not trying to point you towards anybody, it’s just that you really did look — I saw the look on your face when you looked at that one right there.” Af-terwards, Gillan identified the photo of Walton as a depiction of the man she saw shooting at law enforcement officers.
When the State attempted to call Gillan as a witness during Walton’s jury trial, Walton moved to suppress Gillan’s identification as impermissibly suggestive and likely unreliable. The trial court denied Walton’s motion to suppress.
Ultimately, Walton was convicted of two counts of attempted murder of a law enforcement officer with possession and discharge of a firearm during commission of the attempted murder, and two counts of attempted armed robbery with possession of a firearm during the commission of the attempted armed robbery. After vacating the initial sentencing order, the trial court resentenced Walton to two terms of thirty years for the attempted murders with mandatory minimum sentences of twenty years and two terms of fifteen years for the attempted armed robberies with mandatory minimum sentences of ten years. The trial court ordered that all sentences and mandatory mínimums run consecutively. Walton was not present at his resen-tencing.
On appeal to the First District, Walton argued that the trial court erred by imposing consecutive mandatory minimum sentences. While the First District reversed Walton’s sentences because he was not present at resentencing, the First District concluded that any mandatory minimum sentence required by the 10-20-Life statute must be imposed consecutively to any other sentence imposed for any other felony regardless of whether the defendant fires a gun or only carries or displays it. Walton, 106 So.3d at 528. Walton petitioned this Court for review.
ANALYSIS
Walton has identified three errors that merit quashing the First District’s decision. The trial court erred in (1) concluding that section 775.087, Florida Statutes — the 10-20-Life statute — required Walton’s sentences to be imposed consecutively, (2) failing to instruct the jury on *64 attempted manslaughter, and (3) admitting improper identification testimony. For the following reasons, we quash the First District’s decision and remand with instructions to return the case to the circuit court for a new trial.
First, the First District erred in concluding that the 10-20-Life statute required Walton’s sentences to be imposed consecutively, irrespective of whether Walton fired, carried, or displayed a firearm. We recently addressed this issue in Williams v. State, 186 So.3d 989 (Fla.2016). We reiterated that “consecutive sentencing of mandatory minimum imprisonment terms for multiple firearm offenses is impermissible if the offenses arose from the same criminal episode and a firearm was merely possessed but not discharged.” Id. at 993. Accordingly, we quash the First District’s opinion to the extent it is inconsistent with Williams.
Second, Walton is entitled to a new trial because the trial court committed fundamental error by failing to instruct the jury on attempted manslaughter as a lesser included offense of second-degree murder. This issue is a pure question of law and is therefore subject to de novo review. Griffin v. State, 160 So.3d 63, 67 (Fla.2015) (citing Puglisi v. State, 112 So.3d 1196, 1204 (Fla.2013)).
“Necessarily lesser included offenses are those offenses in which the statutory elements of the lesser included offense are always subsumed within those of the charged offense.” Sanders v. State, 944 So.2d 203, 206 (Fla.2006). “The law requires that an instruction be given for any lesser offense all the elements of which are alleged in the accusatory pleadings and supported by the evidence adduced at trial.” State v. Weller, 590 So.2d 923, 926 (Fla.1991). “The trial judge has no discretion in whether to instruct the jury on a necessarily lesser included offense. Once the judge determines that the offense is a necessarily lesser included offense, an instruction must be given,” Montgomery v. State, 39 So.3d 252, 259 (Fla.2010) (quoting State v. Wimberly, 498 So.2d 929, 932 (Fla.1986)).
Attempted manslaughter by act is a necessarily lesser included offense of attempted second-degree murder because attempted second-degree murder contains all of the elements of the crime of attempted manslaughter by act. Compare § 782.04(2), Fla. Stat. (2008) (defining second-degree murder as an “unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual”), with § 782.07(1), Fla. Stat. (2008) (defining manslaughter as a “killing of a human being by the act ... of another, without lawful justification ... and in cases in which such killing shall not be excusable homicide or murder”); see also Montgomery, 39 So.3d at 259 (noting that “second-degree murder was only one step removed from the necessarily lesser included offense of manslaughter”). Here, Walton was charged with second-degree murder, with a sentencing enhancement because the victim was a law enforcement officer. See § 782.04(2), Fla. Stat. (2008) (attempted second-degree murder); § 782.065(2), Fla. Stat. (2008) (sentencing enhancement for law enforcement victim). Accordingly, the trial court was required to give an instruction for attempted manslaughter by act when it gave the instruction for attempted second-degree murder.
Not only did the trial court err by failing to give the instruction for attempted manslaughter by act, but its failure constituted fundamental error. Fundamental error occurs “only when the *65 omission is pertinent or material to what the jury must consider in order to convict.” Griffin v. State, 160 So.3d 63, 66 (Fla.2015); see also Montgomery, 39 So.3d at 258 (same). We have repeatedly held that the failure to correctly instruct the jury on a necessarily lesser included offense constitutes fundamental error. See, e.g., Williams v. State, 123 So.3d 23, 27 (Fla.2013) (holding that fundamental error occurs when the trial judge gives an incorrect instruction on the necessarily lesser included offense of attempted manslaughter for a defendant convicted of attempted second-degree murder); Montgomery, 39 So.3d at 259 (same). If giving an incorrect instruction on a necessarily lesser included offense constitutes fundamental error, then a fortiori giving no instruction at all likewise constitutes fundamental error. Accordingly, Walton is entitled to a new trial with correct instructions for the necessarily lesser included offense of attempted manslaughter by act.
Even if the faulty jury instructions did not constitute a fundamental error, we would be forced to quash the district court’s decision because Detective Padgett employed an impermissibly suggestive photo array process. During the trial, Walton argued that Gillan’s identification of Walton as the perpetrator should be excluded because the photo identification procedure was impermissibly suggestive and created a substantial likelihood of mis-identification, We agree.
Since a trial court’s ruling on a motion to suppress is a mixed question of law and fact that determines constitutional rights, we employ a two-step standard of review:
In reviewing a trial court’s ruling on a motion to suppress, appellate courts must accord a presumption of correctness to the trial court’s determination of the historical facts, but must independently review mixed questions of law and fact that ultimately determine the constitutional issues arising in the context of the Fourth Amendment. See Connor v. State, 803 So.2d 598, 608 (Fla.2001); Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999); Albritton v. State, 769 So.2d 438 (Fla. 2d DCA 2000).
Moody v. State, 842 So.2d 754, 758 (Fla.2003).
The primary evil to be avoided in the introduction of an out-of-court identification is a very substantial likelihood of misidentification. An impermissibly suggestive identification procedure is one that creates the danger of misidentification so great that it violates due process. Simmons v. United States, 390 U.S. 377, 386, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The test promulgated by the United States Supreme Court and adopted by this Court is twofold: (1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; and (2) if so, considering the totality of the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification. Simmons v. State, 934 So.2d 1100, 1118 (Fla.2006). In this case, Gillan’s identification should have been excluded because the method employed by the detective was impermissibly suggestive and gave rise to a likelihood of misidentification.
The first prong of the analysis, the presence of a suggestive identification procedure, is satisfied because Detective Padgett repeatedly called Gillan’s attention to the picture depicting Walton. The identification procedure in this case is analogous to the procedure employed in State v. Sepulvado, 362 So.2d 324, 326 (Fla. 2d DCA 1978). In Sepulvado, a detective testified that he asked the victim to look at a photo array containing 150 pictures of *66 white males. Id. at 325. While the victim was still examining the photo array, the detective brought three additional photographs into the interrogation room, all three depicting black males. Id. at 326. After the victim reviewed the 150 pictures, the detective asked the victim to look at the three additional pictures. Id. The victim identified all three men, including the defendant, as his assailants. Id. The Second District held that because the detective called the victim’s attention to the defendant’s picture, the procedure was im-permissibly suggestive. Id. Similarly, in this case, Detective Padgett called Gillan’s attention to the picture without her having given any indication that she recognized Walton, By repeatedly asking Gillan questions about Walton’s photograph, Detective Padgett influenced Gillan to pay special attention to that photo. As in Sep-ulvado, we conclude that the identification procedure employed in this case was suggestive.
We also conclude that considering the totality of the circumstances, the suggestive identification procedure gave rise to a substantial likelihood of irreparable misidentification. To reach that conclusion, we consider the five factors set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972):(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Grant v. State, 390 So.2d 341, 343 (Fla.1980) (citing Biggers, 409 U.S. at 199-200, 93 S.Ct. 375).
As to the first factor, the witness’s opportunity to view the criminal at the time of the crime, we conclude that Gillan did not have a meaningful opportunity to see Walton commit the crime. Gillan witnessed the incident from behind a dumpster, where she managed to “peek” and see two men shooting at law enforcement officers. Gillan provided very little detail of what she witnessed, suggesting that her effort to hide from the gunfire may have understandably thwarted her opportunity to see the incident.
As to the second factor, the witness’s degree of attention, Gillan’s hazy memory of the incident does not give us confidence in her identification of Walton. During her interview, Gillan stated that one of the men had short dreadlocks and that there were two men shooting at law enforcement officers. However, at trial, Gillan was still unsure if one of the suspects had dreadlocks.
The third factor, the accuracy of the witness’s prior description of the assailant, does not weigh in favor of admitting the identification because it is unclear what Gillan’s prior description of the defendant was. Gillan testified that after the shooting, she spoke to police regarding what she witnessed. The record is unclear as to what exactly she told law enforcement officers prior to identifying Walton. As such, we give little weight to this factor. The State points out that at her deposition and at Walton’s trial, Gillan maintained that Walton was one of the men she saw shooting at law enforcement officers. However, that fact is irrelevant because her deposition and her trial testimony occurred after the detective improperly influenced her identification of Walton.
As to the fourth factor, the level of certainty demonstrated by the witness at the confrontation, we conclude that Gillan did not display a high level of certainty when she identified Walton. Gillan initially said she was “not sure” if she recognized anyone. Further, Gillan testified at *67 trial that she was unsure of her identification of Walton.
As to the fifth factor, we conclude that the time between the shooting and the identification was too great for Gillan’s identification to be deemed reliable. Almost two months had passed since the shooting and the date Gillan made the identification of Walton. See Fitzpatrick v. State, 900 So.2d 495, 518 (Fla.2005) (holding that a three-day gap between the observed event and the witness’s identification contributed to the unreliability of the identification).
In short, none of the five factors gives us confidence that Gillan accurately identified Walton as the assailant she saw on September 10, 2008. To the contrary, the faulty photo array procedure gave rise to a substantial likelihood of an irreparable misidentification. See Simmons, 934 So.2d at 1118. Accordingly, we reverse Walton’s convictions because they were tainted by inappropriate evidence of eyewitness identification.
CONCLUSION
For the foregoing reasons, we quash the First District’s decision in Walton to the extent it is inconsistent with this opinion. We also remand this case to the First District with instructions to return this ease to the circuit court for a new trial, at which Walton is entitled to a jury instruction for attempted manslaughter by act and at which the State may not present the tainted evidence of Gillan’s eyewitness identification.
It is so ordered.
LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.